Case number 18-1281. Competitive Enterprise Institute at Appellate v. Federal Communications Commission. Mr. Polio, the appellate. Mr. Sanderson, the appellate. I think he was surprised that he changed his name. Mr. Polio, the appellate. Good morning. May it please the Court, Melissa Holyoak from the Hamilton Lincoln Lawns 2-2 for Appellant. Your Honors, the current FCC Chairman put it best when he said that the merger order that he dissented from was incoherent. And Chairman Pai was highlighting the multiple contradictions in the order. Among the worst he described was the fact that the order gave no explanation why the merger conditions had anything to do with addressing any type of transaction-specific harm. Before we get to the merits, though, you have to show standing, which is not so easy for you. I actually believe standing is satisfied here based on this Court's precedent. We have consumers here that provided substantial evidence regarding their injury that they suffered. It's very similar to the consumer cases that this Court has decided in Community Nutrition or CEI, where you had consumers complaining that they weren't able to find large vehicles. Here you had substantial evidence. You had the appellant's individual declarations that said, yes, we suffered this injury. We are paying more. We believe that our quality of service is going down because the money that they're going to have to spend is not going to our service. And then all of that is corroborated by an expert opinion, expert in the industry, that explained that, yes, when you have to expend significant capital expenditures, billions of dollars, that money is going to be diverted from other resources like investing in networks and upgrades. You have to show standing condition by condition, right? Standing to challenge one is not standing to challenge all, right? No, I actually don't believe that's correct, Your Honor, because if you have standing to challenge... Standing is not dispensed in gross. That's from the Supreme Court. If one person has standing to challenge the order... I'm not talking about people. I'm talking about conditions. The conditions. You might have standing. You've challenged four. Yes. You have to show standing independently, and there are different problems with each. Yes, and they are satisfied. Each one is satisfied. So I'll just, I mean, let's just go through them one by one. Okay, perfect. So usage limits. Yes. What reason do we have to think that the companies would have imposed usage limits but for the condition? We know that they rejected proposals in the past. None of them uses these limits now. That's from one of the dissents. And we have absolutely no information on industry practice with regard to whether that kind of pricing is used or not. Sure, but has the commission recognized that depriving them of that type of income would deprive them of the ability to invest in the infrastructure? And that's in the appendix at 103. So inability to invest in the infrastructure necessarily means that their quality of service is going to decrease. But they had every incentive to be able to, the company has every incentive to be able to try and use these data usage pricing. Except that they apparently hadn't. Correct. But the question on whether it would be redressed is whether it would generate a significant increase in the likelihood. Being able to have this ability to use that pricing. It only makes a difference if they would exercise that option. And they hadn't exercised it before. I mean, if the but for a world is you remove the condition, but for whatever reason they charge, they do the all you can eat buffet option rather than the a la carte option, there's no causation. There's no traceability or redressability. Then why limit the company's ability to do that for seven years? For belt and suspenders protection. I don't know, but it's your burden to show that this matters. Absolutely. And here we know that the companies have every incentive to explore all types of different pricing. The only harm you have is the increase in the rates that are being paid by the three of the four individuals. Yes, correct. Yes. So that's redressable. Now, you're good. Katniss is asking you about addressability and causation. I'm hearing you on causation, but I'm not hearing your answer as to how we can find this is redressable in the action for this board. Community nutrition is actually very instructive on this point because there you had consumers. We're talking about the facts of this case. Absolutely. And I just. Whoa. Wait a minute. Sorry, Your Honor. Don't talk while I'm interrupting, please. What do you have to show that if we entered anything or we can do anything in order to do anything, that it would cause the companies to roll back the price increase? They may be perfectly happy with the price increase, and they're not before us. We can't tell them to roll it back. So how do you have redressability? Absolutely. And if you require. Absolutely what? How do we have redressability? No, but you're correct that you couldn't have the company come in to satisfy redressability and swear we're going to definitely decrease prices. A consumer would never be able to challenge government conduct if that was required. Instead, we have. Well, there are a lot of recommendations which a consumer could challenge. There are a lot of relief. For here, it wouldn't be the consumer, it would be the company, but the company could challenge this. And there is standing for the company to say we can challenge it. That doesn't mean that we can redress the only injury that you allege. Yes. As the commission observed, companies, based on sound economic principles, will pass savings through the consumers, and that's in the appendix at 220. But this court in community nutrition, the same type of issue was milk consumers, who said you have to pay this regulatory payment so my prices have gone up. And the court said you have satisfied redressability here because the contention that the savings will be passed on to the consumers is reasonable. Nothing more is required. And the same is true here. Obviously, redressability, there's going to be some predictive element to it. There can't be complete certainty. But here what we've shown is, based on sound economic principles and the commission's own observation that the company will pass through savings, that if the company is relieved of billions of dollars in payments in capital expenditures, that savings can go to the benefit of the consumers. Let me ask you about the build-up condition. Yes. So that one, your expert's description of what happens seems pretty hedged. To the extent they're doing anything different. We don't know whether the build-out will turn out to be profitable or not. And we do know that a lot of these capital costs are already sunk. The cables are weighed, and we can't undo that expenditure of money. So what basis do we have to find a reasonable probability that if we set aside a requirement to make these huge investments that have already been made, that that would help consumers one bit? Based on the updates of what has been going on, they're about halfway finished. And so it's reasonable that there's likely not all the costs have been sunk in here, particularly when you're talking about billions of dollars. If you could save hundreds of millions to the consumers, that would provide some benefit and redress to the consumers. But here what Dr. Crandall did is he also looked at what the company had been doing historically and the amount of capital expenditures that they had engaged in just prior to the merger and noted that that had typically been going to plant upgrades to help the quality of service for the consumers. And what he said, what he opined, was that if that money that we had to divert to these new projects can then go back to the consumers, that will redress some of these issues. I suppose it turns out that this build-out is a wonderful economic investment for these companies. That doesn't mean it's good for the consumers, that the existing subscribers that at this moment are paying more. The company, if it was going to be a wonderful investment, they would grow organically, like they had previously done, as the commission had observed. But here they're required to make these enormous expenditures rather than taking the decisions out of the boardroom and into the regulatory statutes, regulations regarding how the company should grow. The biggest problem is that, yes, every day the consumers are going to get less and less if these conditions are reversed. But that is because of the fact that the petition for mandamus was pending for over two years, and just days before this court was going to hear it, the commission issued its consideration order. And that's why this court should decide now on the merits. Because Section 405 provides judicial review and says that the petition for reconsideration is a condition of precedent only if the commission had not had the opportunity to pass on the issues. But they have here. They considered all of these issues before, and the court can now decide these issues right now. Any other questions for rebuttal? All right. If you want to save your time for rebuttal. Ms. Sundaresan. Good morning, Your Honors. May it please the Court. My name is Silas Sundaresan, and I represent the Federal Communications Commission. This appeal should be dismissed because neither the individual appellants nor CEI have Article 3 standing before this court. The individual appellants cannot establish causation or reversibility, and CEI has no associational standing because the only member it identifies does not allege a concrete injury. I'd like to turn to the individual appellants first. Three of the four allege a concrete injury, insofar as they claim that their monthly broadband bill has increased after the merger. But they have not demonstrated that this increase is tied to the conditions imposed on New Charter. Let's look to the evidence that appellants provide here. This court has been very clear. The party invoking federal jurisdiction has the burden of establishing standing through evidence. The evidence they provide here are the individual declarations from the four New Charter customers and the declaration from the economist, Dr. Crandall. And they can also point to the administrative record, and they can make arguments based on what we've called basic economic logic, right? Your Honor, certainly they can look to the administrative record, of course, but the sound economic principles that appellants are talking about come from Dr. Crandall's declaration. That's what they keep proffering as their chief piece of evidence in support of causation. And Dr. Crandall's declaration... Let's talk about the commission's view, and let's focus on the EDGE providers for a second. Sure. So is it the commission's current position, as I understand it, is that increased prices from EDGE providers are, to a potentially significant extent, passed through to end users in the form of lower prices for broadband. That's from your 2018 net neutrality order. That's the commission's position. Your Honor, in this instance, though, Charter had already committed not to engage in paid prioritization well before the adoption of this merger order. We speak about that on page 23 of our brief. In fact, each of these conditions, Charter had already committed of their own accord. And, in fact, in the joint appendix on page 52, there's a link to Charter's own merger application. Even in their initial merger application, they had committed not to engage in paid prioritization. But the difference between this condition and the one I was pressing your opponent on is we do know that this is a common industry practice to charge the EDGE providers, right? Yes, it is. Okay. And so they don't have this problem for that condition. And we have your own commission explaining the economic logic linking the revenue from the EDGE providers to lower prices for the subscribers. But with respect to EDGE providers, Your Honor, again, going back to their evidence, which is Dr. Prandtl's declaration, Dr. Prandtl says that as a result of this condition, existing customers will be charged more, will be harmed because they'll be charged more relative to new subscribers, that Charter will have an incentive to charge new subscribers less. But Dr. Prandtl presents no data, no numbers, no quantitative analysis. This is a declaration from an economist. One would expect some data supporting his speculative assertion. I think that in summary form echoes the point that the commission made in the net neutrality order and echoes a point that the Supreme Court made in Ohio v. Amex about these two-sided markets. Your Honor, as you had said earlier to opposing counsel, they have the burden of establishing standing for each one of these conditions. Right. And again, the declaration from their economist that they're chiefly relying on does not prevent any evidence to back up their assertion. Is there anything that prevents them from establishing standing by pointing to the commission's own assessment of economic effects in this other very prominent, important order? No, there's nothing that prevents them, Your Honor. But again, this is not an argument in their own brief. They did not cite to the commission's order or the net neutrality order, my recollection. And moreover, going back to the other three conditions, if I may, so the chief concrete injury that they allege here is the increase in price. Dr. Crandall's declaration provides no support whatsoever for how two of those conditions, the build-out and the low-income broadband program, can be linked to price. And that's because if you look at paragraphs 7 and 9 of Dr. Crandall's declaration, he links those two conditions, build-out and the low-income broadband program, to a decrease in service quality, not to price. You know, opposing counsel is talking about how capital expenditures are very pricey, that's going to increase prices. Their own expert declarant does not say anything about how those two conditions are linked to price. And the individual appellants claim that their service quality is going to go down basically at some unspecified time in the future. But their affidavits were filed over two years ago. They had every opportunity to file supplemental affidavits if, in fact, they experienced a decrease in service quality. And clearly they didn't. So the only concrete injury is a price increase. And Dr. Crandall doesn't even link two of the four conditions to a price increase. With respect to the other condition, the ban on data caps or usage-based pricing, Dr. Crandall alleges that this will lead to increased prices. He says that, quote, a subset of existing customers will be harmed by this condition. Well, he doesn't say whether the subset of existing customers includes the four individual appellants here. Without that requisite link, there's no causation support. Moreover, Charter had already agreed a year before that they had no interest in imposing data caps, and they had an aversion to data caps. We mentioned that in the merger order at the joint appendix at page 420. So for all four of these conditions, their injuries are not fairly traceable to the conditions imposed. And moreover, there certainly is no redressability here, Your Honors. Their only evidence in support of redressability that they submit is a single sentence in Dr. Crandall's declaration, which essentially says if the conditions are revoked, the harms will be reduced. That's plainly a conclusory assertion that this Court should soundly reject. And there's no dispute that the Commission does not regulate the prices that new Charter charges its customers. Under this Court's precedent in Klamath Water, when the government entity being sued does not regulate the rates, there can be no redressability because it's entirely speculative what new Charter is going to do if these conditions are lifted. Klamath Water, Your Honor, from this Court. There, the Court held that FERC, who was the government agency being sued there, because they did not regulate the rates, there could be no redressability. And sister circuits have also agreed with that reasoning. The Tenth Circuit in the Northern Laramie case, the Eighth Circuit in the Burton case. The point is that we can't predict... Aren't those cases where the rates were fixed by a state regulatory agency? Not in the Burton case, Your Honor. That was a case where the utility was also controlling the rates. So, I mean, if you abstract out that aspect of the cases, the proposition you cited has to be overbroad because it would imply that a consumer never has standing to challenge a regulation imposed on the regulated entity. And we have at least some cases which recognize that standing. Sure, Your Honor. We're not saying that consumers would never have standing. What we're saying is that in this particular case, given that Charter had already committed to modified versions of each of these conditions, we simply have no idea what Charter would do if these conditions were lifted. Are you saying all of these conditions reflect the voluntary choice of Charter? Modified versions of each of these conditions. So two of the conditions, the commitment not to engage in paid cardization and the commitment not to engage and not to impose data caps, were put forth by Charter in their initial merger application from 2015. They had also, of their own volition, agreed to adopt a low-income broadband program. One of the pre-merger companies, Bright House, had already implemented a low-income broadband program. And they had committed to a significant build-out. So, yes, they had committed to these conditions of their own accord voluntarily. I mean, if these conditions were so onerous, they surely didn't have to comply with them and move forward with the merger. It's not addressed as a causability, but it would be your position that so far as redressability is involved, the decision to reduce prices would totally be a volitional act by the third party, would it not? We'd have to have both causation and redressability. Now, the redressability that they're asserting would be that if we told the Commission to roll back these conditions, that would reduce the cost of the third-party regulated industry. The third-party regulated industry would then roll back its price. That would be a totally volitional act by the third party, right? That's what they're alleging, but, Your Honor, that's pure speculation on their part. We have no idea. New Charter could just as well pocket the cost savings. Just like what I'm asking you, the volitional act of the third party is necessary for their redressability. Absolutely, Your Honor, and we have an independent third party. We simply don't know what New Charter would do in this instance. If there are no further questions, we ask that this appeal be dismissed. Thank you. All right. Your Honor, to your question regarding the data usage and whether there's evidence, I would also like to cite you to in the record of page 102, where the Commission said that it was imposing that seven-year requirement on the data usage pricing because they had noted in the market that there was increased shifting away from flat rates. So there was evidence that they would be incentivized to explore these other pricing to compete with these other providers. What do you do with the argument that all of these conditions were voluntarily proposed on the front end by the FCC and that they would be extracted in the course of the negotiation with the FCC? Sure, and I think the Pai's dissent explains how voluntary these are when they come in with the applications and they are basically a result of these negotiations. But if they were so voluntary, then why require the reporting and the conditions at all? If they were able to, if this is just something that was part of their business plan, then they wouldn't need to have any type of compliance or the Bureau wouldn't need to actually double check and make sure that they're meeting all of these different conditions. And as the counselor said, if these conditions were so onerous, then they didn't have to go through with the merger. You're talking about a billion dollar, several billion dollar merger. And they come in with their hat, as Commissioner Pai says, with their hat in hand, what can we do? What's the cost of doing business with the FCC? And this is the cost of doing business. This is what you need to do. They negotiate these voluntary commitments. Any other questions, Your Honors?
judges: Henderson, Katsas, Sentelle